UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
ARIF S. IZMIRLIGIL,

                          Plaintiff,

                                                    **MEMORANDUM & ORDER**
             - against -                              18-CV-7043 (PKC) (LB)

SELECT PORTFOLIO SERVICING, INC.,

                          Defendant.
---------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

        Plaintiff Arif Izmirligil, proceeding *pro se*, brings this action against Defendant Select

Portfolio Servicing, Inc. ("SPS"), alleging claims pursuant to the Real Estate Settlement

Procedures Act ("RESPA"), 12 U.S.C. §§ 2601 *et seq.*, and its implementing regulations, known

as Regulation X, 12 C.F.R. §§ 1024 *et seq.*, as well as the Fair Debt Collection Practices Act

("FDCPA"), 15 U.S.C. §§ 1692 *et seq.*  Pending before the Court are Defendant's motion to

dismiss and two motions to amend by Plaintiff.  For the reasons set forth below, the Court grants

in part and denies in part Defendant's motion to dismiss.  Furthermore, though the Court denies

Plaintiff's motions to amend, it does grant Plaintiff leave to file an amended complaint as described

herein.

## BACKGROUND

**I.    Relevant Facts[1]**

        On July 26, 2006, Plaintiff secured a mortgage loan (the "Loan") from JP Morgan Chase

Bank, N.A. in the original principal amount of $1,100,000.00.  (Complaint ("Compl."), Dkt. 1,

---

[1] In deciding a motion to dismiss under Rule 12(b)(6), the Court must assume as true the
allegations in the complaint.  *Littlejohn v. City of New York*, 795 F.3d 297, 306–07 (2d Cir. 2015).

¶ 8; Complaint Exhibit ("Compl. Ex.") 1, Dkt. 1-1, at ECF[2] 2.)  The Loan was used to purchase a property at 15 Sailors Court, Miller Place, New York.  (Compl., Dkt. 1, ¶¶ 2, 8.)  Plaintiff's Loan has been in default, falsely, according to Plaintiff, since at least December 2009, when the loan was accelerated and a foreclosure action was filed.  (*Id.* ¶ 50; *see also* Compl. Ex. 19, Dkt. 1-19.)  On November 1, 2013, Defendant, which is known as a servicer for defaulted loans, began servicing the Loan.  (Compl., Dkt. 1, ¶¶ 47–48.)

Since November 2013, Defendant has engaged in written communication with both Plaintiff and Plaintiff's counsel.  Communications directly between Defendant and Plaintiff occurred even though Plaintiff had sent at least two cease-and-desist letters to Defendant asking that it communicate with his attorney instead.  (*Id.* ¶ 64.)  The earliest of these letters was sent on November 4, 2013, indicating that Defendant should communicate with Plaintiff's attorney, Ronald D. Weiss.  (*Id.*; Compl. Ex. 23, Dkt. 1-23, at ECF 4.)  On April 4, 2018, Plaintiff sent another "Cease and Desist Contact Letter" indicating that Defendant should communicate with Plaintiff's new attorney, David L. Singer.  (Compl. Ex. 23, Dkt. 1-23, at ECF 3.)  Defendant, at times, did communicate with Plaintiff's counsel as requested.  (*See, e.g.*, Compl. Ex. 24, Dkt. 1-24, at ECF 2 (addressing a January 4, 2018 letter to Plaintiff's attorney Ronald Weiss).)

In the year preceding the filing of this action, Defendant sent Plaintiff monthly statements regarding the Loan.  (Compl., Dkt. 1, ¶ 51; *see also* Compl. Ex. 20, Dkt. 1-20.)  Though Plaintiff appears to allege that these statements were sent to him directly, the monthly statement included as an exhibit to Plaintiff's complaint is addressed to Plaintiff's attorney, Mr. Weiss.  (*See* Compl. Ex. 20, Dkt. 1-20.)  These statements were "printed or computer generated forms" that noted "[if]

---

[2] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

payment is received after [date,] $148.21 late fee will be charged." (Compl., Dkt. 1, ¶ 53.) Each monthly statement also reflects a charge of $7,443.00 labeled as "other charges and fees," which is included in the total amount due. (*Id.* ¶ 60; *see also* Compl. Ex. 20, Dkt. 1-20.) Defendant also sent Plaintiff payoff statements dated March 13, 2018, April 2, 2018, April 10, 2018, April 14, 2018, April 17, 2018, May 1, 2018, June 5, 2018, and June 18, 2018. (Compl., Dkt. 1, ¶ 81.) These payoff statements were sent to Plaintiff at his dental office address. (*Id.*; *see also* Compl. Ex. 21, Dkt. 1-21.) The payoff statement included a $7,443.00 charge labeled "Loan Level Advance Balance." (Compl., Dkt. 1, ¶ 61; *see also* Compl. Ex. 21, Dkt. 1-21.) In an April 23, 2018 letter to the Honorable Joseph R. Bianco,[3] Defendant explained that this charge consisted of "servicing-related expenses rather than escrow expenses paid with servicer funds that are to be recovered from the borrower" and included attorney's fees and costs for the underlying foreclosure action. (Compl. Ex. 22, Dkt. 1-22, at ECF 3.) The April 10, 2018 Payoff Statement provided by Plaintiff includes similar explanatory language:

> If the account is currently subject to a pending foreclosure or bankruptcy action, the attorney fees and costs for services rendered that have been incurred with respect to this pending action have been included in the outstanding amounts due. Legal actions may continue after the date of this letter, and if so, will result in additional attorney fees and costs. An estimate of those amounts to be incurred between the date of this quote and the good through date[4] are included. In the event that upon completion of the related legal work the actual legal fees and costs charged by the attorney SPS are less than the estimates provided by the attorney in this quote, SPS will apply such overage to any other amounts due and owing. If there are no amounts due, SPS will refund such overage directly to the customer.

---

[3] As discussed in more detail *infra* n.8, Judge Bianco presided over another federal court action between Plaintiff and Defendant. Defendant submitted the April 23, 2018 letter as part of that litigation.

[4] This is the date that the Payoff Statement expires and becomes void. (Compl. Ex. 21, Dkt 1-21, at ECF 3.)

(Compl. Ex. 21, Dkt 1-21, at ECF 3.)  Plaintiff alleges that at least some of these charges were not yet due at the time that the monthly and payoff statements were issued.  (Compl., Dkt. 1, ¶ 63.)

Between December 27, 2015 and July 30, 2018, Plaintiff and/or Plaintiff's counsel sent several Qualified Written Requests[5] ("QWR") to Defendant.[6]  (*See id.* ¶ 71.)  On December 27, 2015 Plaintiff sent his first QWR requesting information as to the Lender-Placed Insurance Policy[7] ("LPI Policy") placed on Plaintiff's account, as well as a "copy of the Detailed Payment History demonstrating the servicing activity from the inception of the above alleged loan from July 26, 2006 until today."  (Compl. Ex. 3, Dkt. 1-3.)  Defendant's counsel responded on January 27, 2016 stating that

> [a]ccording to SPS' records, LPI was placed on the Property . . . effective November 1, 2013 to November 1, 2014 ("LPI Policy"). . . .  However, it appears your client [Plaintiff] subsequently obtained a retail policy on the Property, and as

---

[5] "A QWR is 'correspondence that identifies a borrower's account and includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.'" *Castro v. Bank of N.Y. Mellon for CWalt Inc.*, No. 17-CV-4375 (JS) (GRB), 2018 WL 4158344, at *3 (E.D.N.Y. Aug. 30, 2018) (quoting *Mack v. ResCap Borrower Claims Tr.*, 678 F. App'x 10, 14 (2d Cir. 2017)); *see also* 12 U.S.C. § 2605(e)(1)(B).

[6] The record is unclear as to exactly how many QWRs Plaintiff sent.  The July 30, 2018 QWR, sent by Plaintiff's counsel, notes that Plaintiff and Plaintiff's counsel had sent a total of seven QWRs.  (Compl. Ex. 16, Dkt. 1-16, at ECF 2.)  However, Plaintiff only describes five QWRs in his complaint.  (Compl., Dkt. 1, ¶¶ 11, 19, 21, 24, 28.)  In its dismissal motion briefing, Defendant provided "copies of each of Plaintiff's letters and purported QWRs, and Defendant's responses."  (Defendant's Declaration in Support, Dkt. 18-1, at 6.)  According to Defendant's list, Plaintiff sent a total of six QWRs, dated December 27, 2015, March 5, 2018, March 25, 2018, June 1, 2018, June 15, 2018, and July 30, 2018.  (*Id.*; *see also* Defendant's Exhibit ("Def.'s Ex.") 1, Dkt. 18-2 (Plaintiff's Dec. 27, 2015 QWR); Def.'s Ex. 4, Dkt. 18-5 (Plaintiff's Mar. 5, 2018 QWR); Def.'s Ex. 7, Dkt. 18-8 (Plaintiff's Mar. 25, 2018 QWR); Def.'s Ex. 11, Dkt. 18-12 (Plaintiff's June 1, 2018 QWR); Def.'s Ex. 12, Dkt. 18-13 (Plaintiff's June 15, 2018 QWR); Def.'s Ex. 1, Dkt. 18-17 (Plaintiff's July 30, 2018 QWR).)  However, it appears that this list is also not fully accurate, as a letter from Defendant's counsel, dated July 17, 2018, *i.e.*, before the instant action was filed, notes that it also received purported QWRs from Plaintiff on June 25, 2018 and June 30, 2018.  (Def.'s Ex. 15, Dkt. 18-16, at ECF 2.)

[7] This insurance is also known as forced-placed hazard insurance.

> a result, SPS terminated the LPI Policy.  Since the termination of the LPI Policy in
> July of 2014, we understand no additional LPI has been placed on the Property . . . .

(Compl. Ex. 4, Dkt. 1-4, at ECF 3.)  Defendant's response also included a copy of Plaintiff's Note,
Mortgage, and payment history.  Defendant noted that "attorneys' fees related to the above
Litigation, which are not included in the total outstanding balance, have been redacted from the
Payment History."  (*Id.*; *see id.* at ECF 3–4 (noting that a "Recoverable Balance" of $7,443
"includes all amounts advanced by SPS or the prior servicer that are recoverable pursuant to the
terms of your client's Mortgage").)  Plaintiff argues that Defendant's response was false because
the "Lender Placed Insurance Confirmation of Cancellation" was not issued until October 31,
2017.  (Compl., Dkt. 1, ¶ 13; *see also* Compl. Ex. 5, Dkt. 1-5, at ECF 2.)  This confirmation form
also notes that the "cancellation [of the lender placed insurance] is effective at 12:01 a.m. on
11/01/2013."  (Compl. Ex. 5, Dkt. 1-5, at ECF 2.)   A Financial Breakdown Statement from
Defendant indicates that a "Hazard Premium Refund" in the amount of $7,443 was issued on
November 2, 2017.  (*Id.* at ECF 3.)

> Plaintiff sent a second QWR on March 5, 2018,
>
> demanding "Detailed Accounting Records" of SPS Acc #15632763, more
> specifically in regard to unapplied and/or missing payments between July 26, 2006
> and October 31[,] 2006 totaling more than $20,000.00 and between April 1, 2009
> and July 21, 2009, totaling more than $32,000.00, in addition to demanding
> explanation for the "Defective 30-days Notice of Default" . . . .

(Compl. Ex. 8, Dkt. 1-8, at ECF 2–3.)  Plaintiff also noted that the letter was regarding "Izmirligil
v. SPS, et al, Case No: 17-cv-06157 (JFB)(AYS)(E.D.N.Y)"[8] and that he was now represented by
David L. Singer.  (*Id.* at ECF 2.)  Defendant responded on March 20, 2018, stating that

---

[8] In addition to the underlying state foreclosure action, Plaintiff filed a federal complaint
against Defendant on October 23, 2017 ("the 2017 Action"), alleging violations of the Racketeer
Influenced and Corrupt Organizations ("RICO") Act, as well as several state law claims.  *See
generally* Complaint, *Izmirligil v. Select Portfolio Servicing, Inc.*, No. 17-CV-6157 (PKC) (LB)

We have received your correspondence and the issues presented in your letter are part of an ongoing litigation.  SPS is aware of the issues presented in your letter and would like to work with you to reach a resolution.  Due to the current litigation, SPS believes that it would be more appropriate to refrain from providing a detailed response to you at this time.  We encourage you to continue working with our legal counsel to determine the available resolution options.  Our legal department will respond under separate cover.

(Compl. Ex. 9, Dkt. 1-9.)  Defendant's March 20, 2018 response also noted that "[b]ased on your recent correspondence, we have updated our records and removed Ronald D. Weiss from the mailing address" and that "[a]s of the date of this letter, the account [was] due [as of] May 1, 2009 or 107 payments past due."  (*Id.*)

Plaintiff or his attorney sent three more QWRs to Defendant on March 25, 2018, June 25, 2018, and July 30, 2018.[9]  (Compl., Dkt. 1, ¶¶ 21, 24, 28.)  Though Plaintiff's third QWR does not make any specific requests, but instead makes various legal allegations against Defendant (Compl. Ex. 11, Dkt. 1-11), Plaintiff's fourth and fifth QWRs requested information as to why the payment history does not reflect certain escrow deposits and payments, why Plaintiff's account was declared to be in default on April 1, 2009 even though Plaintiff had made payments as late as July 2009, and what certain charges on Plaintiff's payoff and mortgage statements were for.  (Compl. Ex. 13,[10] Dkt. 1-13, at ECF 2–3; *see also* Compl. Ex. 16, Dkt. 1-16, at 3–5 (noting discrepancies between various payment histories provided by SPS).)  Defendant responded to each of these letters with the same language it used in its March 20, 2018 letter, *i.e.*, noting that the issues

---

(E.D.N.Y. Oct. 23, 2017), ECF No. 1.  The Court is simultaneously issuing a separate decision in that case regarding Defendants' motion to dismiss for lack of standing.

[9] The July 30, 2018 QWR was sent by Plaintiff's counsel, David Singer.  (Compl. Ex. 16, Dkt. 1-16, at ECF 2.)

[10] Though Plaintiff alleges that he sent his fourth QWR on June 25, 2018, the letter he attaches as the relevant exhibit is dated June 1, 2015.  (*Compare* Compl., Dkt. 1, ¶ 24, *with* Compl. Ex. 13, Dkt. 1-13.)

presented in Plaintiff's letters are part of ongoing litigation, as well as specifying how many payments were past due on Plaintiff's account, but not providing any specific information in response to Plaintiff's inquiries. (*See* Compl. Ex. 12, Dkt. 1-12; Compl. Ex. 14, Dkt. 1-14; Compl. Ex. 17, Dkt. 1-17.) Plaintiff alleges that Defendant's "untimely, inadequate, insufficient and misleading explanation of why the information and corrective action requested by Plaintiff [] was unavailable or could not be obtained" caused damages, including attorney's fees, court fees, "printing, copying, and postage fees, uncorrected late fees, unapplied or misapplied mortgage payments, business loss, loss of retirement funds, mental anguish, embarrassment, nausea, and emesis." (Compl., Dkt. 1, ¶¶ 73–75; *see also id.* ¶¶ 16, 23, 26.) Plaintiff also alleges that Defendant engaged in a pattern or practice of violating RESPA. (*Id.* ¶ 77.)

## II. Procedural History

On December 11, 2018, Plaintiff initiated the instant action seeking actual, statutory, and punitive damages, as well as injunctive relief.[11] (Compl., Dkt. 1.) Plaintiff also requested that the instant action be consolidated with the 2017 Action, which the Court denied on March 25, 2019. (Mar. 25, 2019 Docket Order.) Defendant's motion to dismiss was fully briefed on May 22, 2019. (Dkts. 18–20, 22.) On May 31, 2019, the Court construed Plaintiff's letter as a motion to amend his complaint to include a claim pursuant to New York Judiciary Law § 487 ("§ 487") against Defendant's counsel in the instant action. (May 31, 2019 Docket Order.) Defendant responded to Plaintiff's motion to amend on July 1, 2019. (Dkt. 24.) On March 6, 2020, Plaintiff filed a letter noting that the New York Appellate Division, Second Department had recently ruled to allow a § 487 claim brought by Plaintiff against the lawyers who had initiated the foreclosure action

---

[11] This action was originally assigned to the Honorable Joseph F. Bianco. (Mar. 11, 2019 Docket Order.) It was reassigned to the undersigned on March 21, 2019. (Mar. 21, 2019 Docket Order.)

against Plaintiff, identified collectively as "the Baum defendants,"[12] to proceed.  (Letter, Dkt. 25; *see also* Defendant's Response Letter, Dkt. 26, at ECF 1 (noting that "[t]he Appellate Division held that the cause of action for alleged violation of Judiciary law §487 as asserted against the Baum Defendants in the 2015 Action[13] should have survived dismissal").)  Plaintiff requests that his § 487 claim against the Baum Defendants be added to the instant action.  (Letter, Dkt. 25.)

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556).  Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679 (citation omitted).  "In addressing the sufficiency of a complaint, [the Court] accept[s] as true all factual allegations and draw[s] from them all reasonable inferences; but [the Court is] not required to credit conclusory allegations or

---

[12] The Baum Defendants are Steven J. Baum, P.C., Steven J. Baum, Brian B. Kumiega, and Patricia Esdinsky.  (Appellate Division Decision & Order, Dkt. 26-1, at ECF 4.)  Steven J. Baum, P.C., commenced the foreclosure action against Plaintiff.  (*Id.*)

[13] The 2015 Action is a state court proceeding brought by Plaintiff where he sought to, *inter alia*, cancel the record of assignment of his mortgage pursuant to New York Real Property Law § 329.  (Appellate Division Decision & Order, Dkt. 26-1, at ECF 4.)

legal conclusions couched as factual allegations." *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir.

2013).

"A document filed *pro se* is to be liberally construed, and a pro se complaint, however

inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by

lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal quotation marks and citations

omitted). Nonetheless, "a plaintiff's obligation to provide the 'grounds' of his entitlement to relief

requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of

action will not do. Factual allegations must be enough to raise a right to relief above the

speculative level." *Twombly*, 550 U.S. at 555 (internal quotation marks, brackets, and citation

omitted).

## DISCUSSION

### I.    Defendant's Motion to Dismiss

#### A.    Plaintiff's RESPA Claims

Plaintiff alleges that Defendant violated RESPA in a variety of ways, including improperly

charging Plaintiff for an LPI policy, failing to timely refund these charges, and inadequately

responding to his QWRs. (Compl., Dkt. 1, ¶¶ 71–74.) Defendant argues that Plaintiff's RESPA

claim should be dismissed because (1) RESPA does not apply to a defaulted loan, (2) Defendant

adequately responded to Plaintiff's QWRs, and (3) Plaintiff did not sufficiently allege damages.

(Defendant's Brief ("Def.'s Br."), Dkt. 18-20, at 5–13.) Defendant also argues that Plaintiff's

claims regarding Defendant's imposition of an LPI policy are barred by the statute of limitations.

(*Id.* at 13–14.)

1. <u>Defendant's LPI Policy</u>

Section 2605 of RESPA prohibits servicers from "obtain[ing] force-placed hazard insurance unless there is a reasonable basis to believe the borrower has failed to comply with the loan contract's requirements to maintain property insurance." 12 U.S.C. § 2605(k)(1)(A). It also requires that

> [w]ithin 15 days of the receipt by a servicer of confirmation of a borrower's existing insurance coverage, the servicer shall-- (A) terminate the force-placed insurance; and (B) refund to the consumer all force-placed insurance premiums paid by the borrower during any period during which the borrower's insurance coverage and the force-placed insurance coverage were each in effect, and any related fees charged to the consumer's account with respect to the force-placed insurance during such period.

12 U.S.C. § 2605(l)(3). Violations under § 2605 must be brought "within 3 years . . . from the date of the occurrence of the violation." 12 U.S.C. § 2614. Here, Defendant imposed the LPI Policy on Plaintiff's mortgage as of November 2013 and charged Plaintiff's escrow account for that insurance between January 2014 and July 2014. (Compl., Dkt. 1, ¶ 12; *see also* Def.'s Ex. 3 Dkt. 18-4, at ECF 28.) Defendant asserts that Plaintiff "subsequently obtained a retail policy,"[14] prompting Defendant to terminate the LPI Policy in July 2014. (Compl., Dkt. 1, ¶ 12.) Given that the latest Defendant imposed the allegedly illegal LPI Policy was July 2014, that statute of limitations for this purported RESPA violation expired in July 2017, more than a year before Plaintiff filed the instant action in December 2018.[15]

---

[14] Plaintiff contests Defendant's assertion that Plaintiff only obtained a retail hazard insurance policy *after* Defendant SPS imposed the LPI Policy; that factual dispute, however, is irrelevant to the statute of limitations analysis, as there is no dispute that Defendant terminated its LPI Policy in July 2014.

[15] As Defendant highlights, Plaintiff is also seeking to amend the complaint in his 2017 Action to add RESPA claims. (Def.'s Br., Dkt. 18-20, at 14.) *See generally* Motion to Amend, *Izmirligil v. Select Portfolio Servicing, Inc.*, No. 17-CV-6157 (PKC) (LB) (E.D.N.Y. Oct. 18, 2019), ECF No. 68. However, even if Plaintiff's claim could relate back to the filing of his

Plaintiff instead argues that the statute of limitations for his claims relating to the imposition of the LPI Policy began to run on October 31, 2017, because that is when non-party American Security Insurance Company sent a letter noting that it was cancelling the LPI Policy effective November 1, 2013.  (*Id.* ¶ 13; Pl.'s Ex. 5, Dkt. 1-5, at ECF 2.)  However, RESPA's statutory language makes clear that the statute of limitations begins to run when the violation occurs.  *See* 12 U.S.C. § 2614 (stating that violations under Section 2605 must be brought "within 3 years . . . *from the date of the occurrence of the violation*") (emphasis added).  The violation for the imposition of the false LPI Policy occurred, at the latest, in July 2014.  Plaintiff failed to file the instant complaint within three years of this violation occurring.  Accordingly, Plaintiff's RESPA claim based on the imposition of the LPI Policy and the assessment of premiums for that policy is time-barred.

Likewise, Plaintiff alleges that Defendant violated RESPA by failing to timely refund the illegal LPI Policy charges.  (Compl., Dkt. 1, ¶ 15.)  However, though Plaintiff notes that the LPI charges were refunded on November 2, 2017 (*id.*), which is within the statute of limitations, he does not allege when he requested that they be refunded or provided proof that he had his own insurance.  RESPA is only violated if Defendant failed to refund the LPI Policy charges within 15 days of receiving proof that Plaintiff had the proper insurance.  Plaintiff appears to argue that Defendant's obligation to refund the LPI Policy charges accrued when Plaintiff filed the 2017 Action, on October 23, 2017.  (*Id.*)  *See* Complaint, *Izmirligil v. Select Portfolio Servicing, Inc.*, No. 17-CV-6157 (PKC) (LB) (E.D.N.Y. Oct. 23, 2017), ECF No. 1.  Assuming that this was the first time that Plaintiff provided Defendant with the necessary proof that he had the proper

---

previous action, any claims based on the imposition of the LPI Policy in 2014 would still be time-barred, since that action was filed on October 23, 2017.

insurance during the relevant period,[16] Plaintiff cannot state a RESPA violation:  Plaintiff filed the

2017 Action on October 23 and Defendant refunded the charges on November 2—10 days later,

*i.e.*, within the 15-day period mandated by RESPA.[17]  Accordingly, Plaintiff has also not alleged

a RESPA violation based on when Defendant refunded the LPI Policy charges to Plaintiff.

2.   Defendant's Inadequate Response to Plaintiff's QWRs

"RESPA is a consumer-protection statute . . . [that] imposes short timeframes for mortgage

servicers to respond to potentially detailed inquiries."  *Roth v. CitiMortgage Inc.*, 756 F.3d 178,

181 (2d Cir. 2014) (citing *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624 (2012)).  The purpose of

RESPA is to "insure that consumers throughout the Nation are provided with greater and more

timely information on the nature and costs of the settlement process and are protected from

unnecessarily high settlement charges caused by certain abusive practices . . . ."  12 U.S.C.

§ 2601(a).  Accordingly, "[w]hen a servicer receives a QWR, it must acknowledge receipt within

five days and depending on the nature of the inquiry, take certain actions within thirty days."

*Castro*, 2018 WL 4158344, at *3 (citing 12 U.S.C. § 2605(e)(1)-(2)).  These actions can include

making the requested corrections to the borrower's account, or, after an investigation, providing

---

[16] However, the Court notes that exhibits Plaintiff provided in the 2017 Action suggest that Plaintiff had actually provided Defendant documentation of Plaintiff's self-purchased hazard insurance as early as December 2013.  Compl. Ex. 5, *Izmirligil v. Select Portfolio Servicing, Inc.*, No. 17-CV-6157 (PKC) (LB) (E.D.N.Y. Oct. 23, 2017), ECF No. 1-5.  This would mean that Defendant's failure to refund the LPI Policy charges occurred, at the latest, in January 2014.  This would put Plaintiff's claim beyond the three-year statute of limitations and render it time-barred.

[17] Plaintiff alleges that he filed the 2017 Action on October 18, 2017.  (Compl., Dkt. 1, ¶ 15.)  The Court notes that though the date of entry of the complaint on the Court's docket is October 23, 2017, the complaint itself is dated October 18, 2017.  *See* Complaint at 57, *Izmirligil v. Select Portfolio Servicing, Inc.*, No. 17-CV-6157 (PKC) (LB) (E.D.N.Y. Oct. 23, 2017), ECF No. 1.  However, even accepting Plaintiff's October 18, 2017 date, Defendant's November 2, 2017 refund was still within the mandated 15-day period.

written explanations as to why the servicer believes the account is correct or why the information requested by the borrower is unavailable or cannot be obtained by the servicer. *See* 12 U.S.C. § 2605(e)(2).

Plaintiff alleges that he and his counsel sent several QWRs between December 2015 and July 2018 (Compl., Dkt. 1, ¶¶ 11, 19, 21, 24, 28), and Defendant argues that they adequately responded to these requests[18] (Def.'s Br., Dkt. 18-20, at 7–10). However, the evidence provided

---

[18] Defendant also argues that RESPA does not apply to loans that are in default because RESPA only requires a loan servicer to respond to QWRs related to the servicing of loans. (Def.'s Br., Dkt. 18-20, at 5–7.) It asserts that since servicing

> means receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan . . . and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan,

servicing ceases once a loan is in default. (*Id.* at 6 (quoting 12 U.S.C. § 2605(i)(3)).) Defendant also cites to a few out-of-circuit cases that have found RESPA inapplicable when the loan is in default. (*Id.*) However, it does not appear that this issue has been squarely addressed by any court in the Second Circuit.

The Court finds Defendant's argument unavailing. Even if the loan is in default, Plaintiff may still wish to request information about or correct past errors in the servicing that occurred before the loan was in default. Defendant does not provide any case law to suggest that this would not constitute a request under RESPA as to the servicing of a loan. Of course, the fact that a loan is in default might limit the types of requests that are related to the servicing of the loan or make it unlikely that a borrower could show that he suffered actual damages as a result of a servicer's failure to comply with RESPA. However, neither of these circumstances suggests that RESPA contains a blanket exclusion for a loan that is in default. As the Honorable Leonard D. Wexler noted, when determining whether a foreclosure order extinguished all RESPA claims related to that foreclosed loan, "a rote finding that a foreclosure order extinguishes all RESPA claims would be contrary to Congress's intent to protect borrowers from unscrupulous servicers, since the latter would effectively be encouraged to complete foreclosure proceedings as quickly as possible to avoid liability under RESPA." *McCann v. Rushmore Loan Mgmt. Servs., LLC*, No. 15-CV-6502 (LDD), 2017 WL 1048076, at *3 (E.D.N.Y. Mar. 16, 2017). Likewise, here, finding such an exception would go against the consumer-protective purpose of RESPA. Indeed, it is after a loan has been declared in default that a consumer is likely to have questions of the lender and ones of a pressing nature that need to be answered promptly. Therefore, the Court does not find that the default status of Plaintiff's loan automatically shields Defendant from RESPA liability based on the alleged failure to properly respond to Plaintiff's QWRs. Instead, the Court will determine

by the parties presents a more complicated picture.  For example, the Court finds that Defendant did provide a sufficient response to Plaintiff's December 27, 2015 QWR, his first QWR, because as requested, Defendant explained why it had imposed an LPI Policy, what charges were made, and when those charges ceased.  (Compl. Ex. 4, Dkt. 1-4, at ECF 3.)  Defendant also provided Plaintiff's payment history, as well as other relevant documents, as requested.  (*Id.*; *see also* Def.'s Ex. 3, Dkt. 18-4, at ECF 6–64.)  However, this thorough response to Plaintiff's first QWR is contrasted by Defendant's conclusory response to Plaintiff's next QWR, dated March 5, 2018.  In that letter, Plaintiff asked for clarification as to why his payment history did not reflect certain payments he had made, as well as information as to why his account had defaulted.  (Compl. Ex. 8, Dkt. 1-8, at ECF 2–3.)  In its March 20, 2018 response, Defendant asserted that it will "refrain from providing a detailed response" because the issues that Plaintiff raised are related to ongoing litigation.  (Compl. Ex. 9, Dkt. 1-9, at ECF 2.)  Defendant repeated this assertion in response to several other of Plaintiff's requests.  (*See, e.g.*, Compl. Ex. 12, Dkt. 1-12 (April 5, 2018 response); Compl. Ex. 14, Dkt. 1-14 (July 9, 2018 response); Compl. Ex. 17, Dkt. 1-17 (April 13, 2018 response).  *But see* Def.'s Ex. 15, Dkt. 18-16, at ECF 3 (clarifying "some general inaccuracies raised by [Plaintiff]" as to why his loan was in default as of April 1, 2009 in a July 17, 2018 response to Plaintiff's June and July QWRs).)  Though the Court appreciates the difficult place that Defendant was put in, as a party to litigation involving the same issues being raised in these QWRs, RESPA does not contain any pending-litigation exception that allows Defendant to avoid

---

whether any individual letter sent by Plaintiff requests information as to the servicing of his loan and is therefore a QWR as defined by RESPA, and whether Plaintiff has sufficiently alleged that Defendant's response to any QWR was inadequate.

its obligation to sufficiently respond to Plaintiff's QWRs.[19]  As such, the Court finds that Plaintiff has adequately stated a claim that Defendant failed to sufficiently respond to at least one, if not more, of his QWRs as required by RESPA.

However, "[t]o survive a motion to dismiss, a plaintiff bringing a Section 2605 claim must, in addition to showing defendant's failure to comply with the provisions of Section 2605, identify damages that he or she sustained as a result of defendant's alleged violation(s)." *Kapsis v. Am. Home Mortg. Servicing Inc.*, 923 F. Supp. 2d 430, 444 (E.D.N.Y. 2013); *see also Dolan v. Select Portfolio Servicing*, No. 03-CV-3285 (PKC) (AKT), 2016 WL 4099109, at *5 (E.D.N.Y. Aug. 2, 2016) (holding that Section 2605 "seeks to redress actual damages caused by the failure of one private party, *i.e.*, a loan servicer, to provide specific information to another private party, *i.e.*, a borrower[,] . . . [and] the plain language of Section 2605 indicates that an allegation of actual damages is necessary to state a claim for liability").

---

[19] Defendant does not provide any case law to suggest that such an exception has been judicially created, nor can the Court find any such rule.  *Cf. Santander Bank, Nat. Ass'n v. Sturgis* ("*Santander Bank*"), No. 11-CV-10601 (DPW), 2013 WL 6046012 (D. Mass. Nov. 13, 2013).  In *Santander Bank*, the district court noted that it

> could find only one case articulating the responsibility of a lender to respond to a purported QWR that requests certain information related to servicing, but the general tenor of which is a broad request for essentially any and all documents that may or may not contain information that might assist the borrower in litigation related to an impending foreclosure.  As the court [in *McDonald v. OneWest Bank, FSB*, 929 F. Supp. 2d 1079, 1094–95 (W.D. Wash. 2013)] explained, the requirement that QWRs be limited to inquiries related to the servicing of a loan was intended to "forestall the feared flood" of documentation requests made by borrowers who had defaulted on their loans.

2013 WL 6046012, at *13 (citations omitted), *abrogated by Galvin v. U.S. Bank, N.A.*, 852 F.3d 146 (1st Cir. 2017).  Thus, as suggested in *Santander Bank*, even though a consumer's QWR might relate to the subject of ongoing litigation, the lender still has a responsibility under RESPA to respond to it, if the inquiry relates to the servicing of the consumer's loan, which could include servicing of the loan before it was declared to be in default.

>   Specifically, to state a Section 2605 claim, a plaintiff must sufficiently allege one of two types of damages: (1) actual damages to the borrower as a result of the failure to comply with § 2605; or (2) statutory damages in the case of a pattern or practice of noncompliance with the requirements of § 2605.

*Kapsis*, 923 F. Supp. 2d at 444–45 (internal quotation marks and citations omitted).  "[T]he courts have consistently dismissed complaints under RESPA if they do not allege actual damages or state merely that in a conclusory fashion the defendant caused damages to the plaintiff."  *Corazzini v. Litton Loan Serv. LLP*, No. 09–CV–199 (MAD) (ATB), 2010 WL 6787231, at *12 (N.D.N.Y. June 15, 2010) (internal quotation marks and citation omitted); *Midouin v. Downey Sav. and Loan Ass'n, F.A.*, 834 F. Supp. 2d 95, 113 (E.D.N.Y. 2013) ("[D]ismissal of a claim under 12 U.S.C. § 2605 is appropriate where the complaint merely prays for relief without specifying the injury plaintiff suffered.") (internal quotation marks and citation omitted).

Plaintiff alleges that he "suffered 'actual damages' that were directly and proximately caused" by Defendant's failure to respond to his QWRs.  (*See* Compl., Dkt.1, ¶ 16; *see also id.* ¶¶ 73–75.)  He alleges that his actual damages included "attorney's fee[s], court fees, costs in having to respond to SPS's reinstatement letters, pay-off letters, printing, copying, and postage fees, uncorrected late fees, unapplied or misapplied mortgage payments, business loss, loss of retirement funds, mental anguish, embarrassment, nausea, and emesis."  (*Id.* ¶ 75*; see also id.* ¶¶ 16, 23, 26.)  The Court first notes that, "[s]imply having to file suit" cannot "suffice as a harm warranting actual damages [because] [i]f such were the case, every RESPA suit would inherently have a claim for damages built in."  *Gorbaty v. Wells Fargo Bank, N.A. ("Gorbaty II")*, No. 10-CV-3291 (NGG) (SMG), 2014 WL 4742509, at *6 (E.D.N.Y. Sept. 23, 2014) (internal quotation marks and citation omitted); *see also Tanasi v. CitiMortgage, Inc.*, 257 F. Supp. 3d 232, 271 (D. Conn. 2017) ("Costs incurred after an incomplete or insufficient response are recoverable under RESPA, but costs incurred before the violation occurred, such as the expenses of preparing an

16

initial request for information, cannot serve as the basis for actual damages.") (internal quotation marks and citation omitted).   Likewise, Plaintiff's conclusory allegations about the types of damages he suffered are insufficient to state a claim for damages.  *See Roth v. CitiMortgage Inc.*, No. 12-CV-2446 (SJF) (WDW), 2013 WL 5205775, at *7–8 (dismissing plaintiff's RESPA claim when she alleged damages including "excessive interest charges caused by failure to correct the account, unnecessary late charges caused by failure to correct the account, denial of credit caused by failure to adequately report late payments to credit reporting agencies, photocopying charges, postal charges, travel expenses, attorney costs, worry, anxiety, emotional distress and harm, as well as inconvenience"), *aff'd*, 756 F.3d 178 (2d Cir. 2014).

Moreover, "[s]imply saying that . . . the servicer's failure to respond to a QWR caused damages without specifying how those damages were caused, is not enough to survive a motion to dismiss." *Bonadio v. PHH Mortg. Corp.*, No. 12–CV–3421 (VB), 2014 WL 522784, at *6 (S.D.N.Y. Jan.31, 2014) (internal quotation marks, alterations, and citation omitted).  "[T]he loss alleged must be related to the RESPA violation itself."  *Gorbaty v. Wells Fargo Bank, N.A.* (*"Gorbaty I"*), No. 10-CV-3291 (NGG) (SMG), 2012 WL 1372260, at *5 (E.D.N.Y. Apr. 18, 2012) (internal quotation marks and citation omitted).  Here, Plaintiff does not provide any factual allegations to support the inference that his damages were caused by Defendant's failure to adequately respond to his QWRs, *i.e.*, how or why Defendant's failure caused Plaintiff to lose income or suffer emotionally.  This dooms his claim.  *See Kilgore v. Ocwen Loan Servicing, LLC*, 89 F. Supp. 3d 526, 539 (E.D.N.Y. 2015) ("Thus, to survive a motion to dismiss, the complaint must contain factual allegation[s] suggesting that any damages [plaintiff] suffered were proximately caused by [defendant's] violations of § 2605, and conclusory allegations to that effect will not suffice.") (internal quotation marks and citation omitted); *Gorbaty II*, 2014 WL 4742509,

at *6 (dismissing RESPA claim when plaintiff "[did] not allege how [d]efendants' RESPA violations proximately caused her distress or how her claimed emotional damages relate to Defendants' *servicing* of her loans") (emphasis in original); *Fournier v. Bank of Am. Corp.*, No. 13-CV-702 (TJA), 2014 WL 421295, at *4 (N.D.N.Y. Feb. 4, 2014) ("Because [p]laintiff fails to state how the [d]efendants' alleged violations of RESPA are the proximate cause of her injuries, the Court agrees with [d]efendants that [p]laintiff has failed to allege facts plausibly demonstrating that her physical ailments constitute recoverable damages under RESPA.").[20]

Plaintiff also alleges that he is entitled to statutory damages "as a result of SPS's pattern and practice of violating RESPA." (Compl., Dkt. 1, ¶ 77.) "In order to obtain statutory damages, the plaintiff must establish 'a pattern or practice of noncompliance.'"[21] *Gorbaty I*, 2012 WL 1372260, at *5 (citation omitted) (quoting 12 U.S.C. § 2605(f)(1)). "Pattern or practice in § 2605(f) means a standard or routine way of operating." *Id.* (internal quotation marks and citation omitted). Though Plaintiff alleges five specific instances of Defendant's non-compliance with RESPA relating to his requests, many of his QWRs asked for the same or similar information from

---

[20] Furthermore, the Court notes that even if Plaintiff's RESPA claims as to Defendant's imposition of an LPI policy were not time-barred, they would nonetheless fail because Plaintiff has also failed to allege damages given that all charges for the LPI policy have been refunded. (*See* Compl. Ex. 7, Dkt. 1-7.)

[21] It is not entirely clear whether RESPA permits a plaintiff to recover statutory damages without proving the existence of actual damages. RESPA permits damages equal to the "sum" of "actual damages" and "any *additional* damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section."

*Gorbaty I*, 2012 WL 1372260, at *5 n.9 (emphasis in original) (quoting 12 U.S.C. § 2605(f)(1)). "The word 'additional' suggests that RESPA might not permit recovery of statutory damages alone." *Id.* However, the Court need not decide this issue given that, as discussed *infra*, Plaintiff has failed to adequately allege that Defendant has engaged in a pattern or practice of noncompliance, and therefore is not entitled to statutory damages in any event.

Defendant.  (Compl. Ex. 9, Dkt. 1-9, at ECF 2.)  Furthermore, Defendant did sufficiently respond to at least one of these QWRs.  (Compl. Ex. 4, Dkt. 1-4, at ECF 3; Def.'s Ex. 3, Dkt. 18-4, at ECF 6–64).  *Fournier*, 2014 WL 421295, at *4 (noting that three instances of non-compliance were insufficient to establish statutory damages, "particularly where Defendants responded to Plaintiff's fourth alleged QWR in a timely manner").  And although the Court finds Defendant's "ongoing litigation" response to several of Plaintiff's QWRs inadequate, given the unique circumstances under which Plaintiff submitted the QWRs, *i.e.*, while Plaintiff was in foreclosure proceedings after defaulting on his Loan and after he had filed a lawsuit against Defendant in federal court, the Court finds that these responses do not support a plausible inference of a pattern or practice of RESPA violations by Defendant.  *See Roth*, 2013 WL 5205775, at *8 (noting that defendant's "failure to respond in accordance with RESPA on two (2) occasions to practically identical letters does not establish that it was defendant's 'pattern or practice' to violate the statute") (collecting cases).  Therefore, the Court finds that Plaintiff's alleged instances of non-compliance, on their own, are insufficient to establish that Defendant is engaged in a pattern or practice of violating RESPA.  The only other allegations Plaintiff offers in support of his statutory damages claim is the fact that Defendant previously entered in a consent decree that, in part, addressed past violations of RESPA.  (Compl., Dkt. 1, ¶ 77 (referring the Court to several websites that are no longer available); *see also id.* ¶ 18 (referring the Court to an FTC 2003 press release announcing settlement with SPS).)  However, the fact that Defendant had previously violated RESPA and entered into a consent decree in 2003 where it agreed to ensure compliance with RESPA does not support the inference that more than ten years later, Defendant's standard operating procedure is to violate RESPA.  *See Sutton v. CitiMortgage, Inc.*, 228 F. Supp. 3d 254, 276 (S.D.N.Y. 2017) ("Plaintiff's allegations of widespread misconduct by Defendant are wholly conclusory, and

inadequate to support a claim under RESPA."); *McLean v. GMAC Mortg. Corp.*, 595 F. Supp. 2d 1360, 1365 (S.D. Fla. 2009) (finding that plaintiffs failed to allege statutory damages when they "have presented no evidence of a standard or institutionalized practice of noncompliance by [defendant]"), *aff'd*, 398 F. App'x 467 (11th Cir. 2010); *see also Fournier*, 2014 WL 421295, at *4 (noting that "that two violations of RESPA were insufficient to establish a pattern or practice of noncompliance, where there was testimony that the loan provider serviced a large number of loans in most, if not all, of the 50 states") (internal quotation marks omitted) (quoting *In re Maxwell*, 281 B.R. 101, 123 (Bankr. D. Mass. 2002)).

Accordingly, the Court finds that Plaintiff's RESPA claim, based on Defendant's alleged failure to adequately respond to Plaintiff's QWRs, fails because Plaintiff has failed to adequately allege damages. However, given that Plaintiff is *pro se*, and "[t]he Second Circuit has made clear that district courts 'should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated,'" *Ramnarine v. Johnson*, No. 19-CV-5544 (PKC) (LB), 2019 WL 5309994, at *3 (E.D.N.Y. Oct. 21, 2019) (quoting *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000)), the Court will grant leave to Plaintiff to amend his complaint if he has a good faith basis to believe that Defendant's alleged RESPA failures caused him damages. In doing so, Plaintiff should allege additional facts to show what specific damages he suffered *as a result* of Defendant's failure to adequately respond to his QWRs.[22] *Cf. Bivens v. Select Portfolio Servicing, Inc.*, No. 15-CV-4325 (ELR) (JKL), 2017 WL

---

[22] Plaintiff should also be mindful that not all of his letters would likely qualify as QWRs under RESPA. For example, Plaintiff's March 25, 2018 letter, which merely states various legal allegations (*see* Compl. Ex. 11, Dkt. 1-11), is not related to the servicing of his loan and therefore is not a QWR. *See Sutton*, 228 F. Supp. 3d at 266 (noting that "[a]n inquiry about the validity, ownership, transfer, assignment, or potential modification of a loan is not 'related to the servicing' of the loan and does not constitute a QWR") (quoting *Wolfbauer v. Ocwen Loan Servicing, LLC*, No. 15-CV-3141 (LSC), 2016 WL 1170982, at *3 (D. Neb. Mar. 24, 2016)); *Corazzini*, 2010 WL

8181523, at *8 (N.D. Ga. Dec. 18, 2017) ("That [plaintiff] had not paid his mortgage in years and

had an account history from another source is relevant to the question of damages . . . ."), *report

and recommendation adopted*, 2018 WL 3688935 (N.D. Ga. Feb. 27, 2018).  Likewise, if Plaintiff

believes he has a good faith basis to allege that Defendant's failure to adequately respond to his

QWRs is indicative of Defendant's larger pattern or practice in responding to QWRs, he should

allege specific facts in support of that claim.  Failure to address these deficiencies will result in

Plaintiff's RESPA claim, with respect to the failure to properly respond to QWRs, being dismissed

with prejudice.[23]

### B.    Plaintiff's FDCPA Claims

The FDCPA is "remedial in nature, [so] its terms must be construed in [a] liberal fashion

if the underlying Congressional purpose is to be effectuated."  *Vincent v. Money Store*, 736 F.3d

88, 98 (2d Cir. 2013) (citations omitted) (quoting *N.C. Freed Co. v. Bd. of Governors of Fed.

Reserve Sys.*, 473 F.2d 1210, 1214 (2d Cir. 1973)).   To prevail on an FDCPA claim, three

requirements must be met:

> (1) the plaintiff must be a "consumer" who allegedly owes the debt or a person who
> has been the object of efforts to collect a consumer debt, . . . (2) the defendant
> collecting the debt [must be] considered a "debt collector," and (3) the defendant
> [must] ha[ve] engaged in [an] act or omission in violation of FDCPA requirements.

---

6787231, at *11 ("[R]equests for information regarding origination-related materials, the
securitization of the loan, the lender's general policies and practices, and general complaints about
the lending industry do not satisfy the RESPA's servicing of the loan requirement.") (internal
quotation marks and alterations omitted) (collecting cases).  Accordingly, in the event Plaintiff
chooses to amend his complaint, he should ensure that any actual damages he alleges were caused
by Plaintiff's failure to respond to letters that would qualify as QWRs under RESPA, and he should
specify what damages he claims flowed from each of the alleged QWRs.

[23] The Court reiterates that, as discussed *supra*, Plaintiff's RESPA claims based on the
imposition of the LPI Policy are being dismissed with prejudice as time-barred.

*Okyere v. Palisades Collection, LLC*, 961 F. Supp. 2d 522, 529 (S.D.N.Y. 2013) (internal quotation marks and citation omitted).

At issue in this case is the third requirement.   "In this Circuit, the question of whether a communication complies with the FDCPA is determined from the perspective of the 'least sophisticated consumer.'" *Jacobson v. Healthcare Fin. Servs.*, *Inc.*, 516 F.3d 85, 90 (2d Cir. 2008) (quoting *Clomon v. Jackson*, 988 F.2d 1314, 1318 (2d Cir. 1993)).   "Under this standard, a collection notice can be misleading if it is 'open to more than one reasonable interpretation, at least one of which is inaccurate.'" *Avila v. Riexinger & Assocs.*, *LLC*, 817 F.3d 72, 75 (2d Cir. 2016) (quoting *Clomon*, 988 F.2d at 1319).   However, "[e]ven the least sophisticated consumer can be presumed to possess a rudimentary amount of information about the world and a willingness to read a collection notice with some care." *Wyler v. Comput. Credit, Inc.*, No. 04-CV-2762 (CLP), 2006 WL 2299413, at *2 (E.D.N.Y. Mar. 2, 2006) (internal quotation marks and citations omitted).

Plaintiff alleges that Defendant violated Sections 1692c, 1692e, and 1692f of the FDCPA by sending payoff and monthly mortgage statements that (1) stated that late fees would be collected, even though New York law does not allow the collection of late fees on debt that has been accelerated; (2) included charges for fees related to the underlying state foreclosure proceeding that were not yet due; and (3) were sent directly to Plaintiff even after he sent Defendant several cease-and-desist letters indicating that all correspondence should be sent to his lawyer.  (Compl., Dkt. 1, ¶¶ 82–84.)

### 1.   Monthly Mortgage Statements

Plaintiff alleges that "[e]ach month during the last 12 months, including on or about May 1, 2018, [D]efendant sent [Plaintiff] a monthly statement." (*Id.* ¶ 51.)  He includes a representative monthly statement as Exhibit 20.  (*See id.*; *see also* Compl. Ex. 20, Dkt. 1-20.)  However, that

monthly statement, dated January 11, 2018, is addressed to Plaintiff "C/O Ronald D Weiss, 734 Walt Whitman Rd, Melville, NY 11747." (Compl. Ex. 20, Dkt. 1-20.)[24]  Ronald Weiss was Plaintiff's counsel. (*See* Compl. Ex. 23, Dkt. 1-23, at ECF 4.)

"The FDCPA establishes certain rights for *consumers* whose debts are placed in the hands of professional debt collectors for collection . . . ." *Kropelnicki v. Siegel*, 290 F.3d 118, 127 (2d Cir. 2002) (emphasis added) (internal quotation marks and citation omitted).  Therefore, courts in this circuit have declined to extend the protections of the FDCPA to third parties, such as attorneys, that act as intermediaries between the debt collector and the consumer. *See Williams v. Harris, Klein Assocs., Inc.*, No. 17-CV-3473 (FB) (JO), 2018 WL 5268113, at *2 (E.D.N.Y. Oct. 23, 2018); *Sandoval v. I.C. Sys.*, No. 17-CV-3755 (DLI) (ST), 2018 WL 1582218, at *2 (E.D.N.Y. Mar. 29, 2018); *Vernot v. Pinnacle Credit Servs., LLC*, No. 16-CV-3163 (JFB) (SIL), 2017 WL 384327, at *5 (E.D.N.Y. Jan. 26, 2017).  The Second Circuit has also noted, without deciding, that its "treatment of the FDCPA in other cases lead[] [it] to believe that alleged misrepresentations to *attorneys* for putative debtors cannot constitute violations of the FDCPA." *Kropelnicki*, 290 F.3d at 127 (emphasis in original).  Accordingly, the Court will not analyze Plaintiff's FDCPA claims as they pertain to the monthly mortgage statements sent to Plaintiff between May 2017 and May 2018, which apparently were sent to Plaintiff's counsel and not Plaintiff himself.

However, in an abundance of caution, the Court will grant Plaintiff leave to amend his complaint in the event that any of these monthly mortgage statements, sent within the applicable

---

[24] Plaintiff had sent a cease-and-desist letter to Defendant in November 2013 asking that all further communication be sent to Ronald Weiss, his attorney at the time. (Compl. Ex. 23, Dkt. 1-23 at ECF 4.)  Plaintiff updated this request in April 2018 indicating that his attorney was now David Singer. (*Id.* at ECF 3.)

statute of limitations, were sent to Plaintiff directly and he has a good faith basis to believe that

any such statement represents an attempt to collect a debt that violates the FDCPA.[25]

### 2.   Payoff Statements

Plaintiff alleges that Defendant also sent him payoff statements, dated March 13, 2018,

April 2, 2018, April 10, 2018, April 14, 2018, April 17, 2018, May 1, 2018, June 5, 2018, and June

18, 2018, that violated the FDCPA by including charges for fees related to the underlying state

foreclosure action.  (Compl., Dkt. 1, ¶¶ 63–64, 81.)  Plaintiff also asserts that the mailing of these

payoff statements to him, rather than his attorney, violated the FDCPA because Plaintiff had

requested that Defendant cease communicating with him directly.[26]  (*Id.* ¶¶ 63–64.)  Defendant's

---

[25] The Court notes that Defendant also argues that the monthly mortgage statements identified in the complaint are not subject to the FDCPA because they were sent in compliance with the Truth in Lending Act ("TILA").  (Def.'s Br., Dkt. 18-20, at 16.)  Defendant is correct that several courts, including courts in the Second Circuit, have found that monthly mortgage statements sent in compliance with TILA are not attempts to collect a debt and therefore not subject to the FDCPA.  *See Hill v. DLJ Mortg. Capital, Inc.*, 689 F. App'x 97, 98 (2d Cir. 2017) (summary order); *Moorer v. U.S. Bank N.A.*, No. 17-CV-56 (VAB), 2018 WL 587319, at *17 (D. Conn. Jan. 29, 2018); *see also Brown v. Select Portfolio Servicing, Inc.*, No. 16-CV-62999 (WPD), 2017 WL 1157253, at *3 (S.D. Fla. Mar. 24, 2017).  All of these cases rely on the Consumer Financial Protection Bureau's ("CFPB") guidance regarding the interplay between the FDCPA and TILA. However, the CFPB's guidance specifically discusses whether a debt collector can continue to send a monthly statement in compliance with TILA if a consumer has sent the debt collector a "cease communication" letter.  *See* CFPB Implementation Guidance for Certain Mortgage Servicing Rules, 2013 WL 9001249 (Oct. 15, 2013).  This guidance does not address a debt collector's potential culpability under other provisions of the FDCPA.  Furthermore, the cases Defendant relies on specifically note that the TILA statements in those cases did not contain language demanding payment of the debt.  *See Hill*, 689 F. App'x at 98 (noting that "[n]one of the statements at issue in this case contain any similar debt-demand language"); *Brown*, 2017 WL 1157253, at *3 ("However, periodic statements required by TILA can constitute debt collection activity if the statement contains debt collection language.") (internal quotation marks and citation omitted).  Here, the mortgage statement provided by Plaintiff contains explicit debt collection language.  (Compl. Ex. 20, Dkt. 1-20 (stating that "[t]his is an attempt to collect a debt").) Accordingly, the Court does not find that the CFPB's guidance is relevant to the question of whether the mortgage statements at issue in this case can form the basis of a FDCPA claim based on the content within the statement.

[26] As noted *supra*, Plaintiff also argues that Defendant violated the FDCPA by attempting to charge late fees for debt that had been accelerated, in violation of New York law.  (Compl., Dkt.

only argument as to why Plaintiff has not sufficiently alleged a FDCPA violation is that "[w]ith respect to the payoff statement, there is no collection language whatsoever, and no threat of action. The payoff statement clearly does not meet the requirements of the FDCPA."  (Def's Br., Dkt. 18-20, at 18.)

The Court finds Defendant's argument unavailing.  "Whether a communication is sent in connection with the collection of a debt 'is a question of fact to be determined by reference to an objective standard.'"  *Williams v. Rushmore Loan Mgmt. Servs., LLC*, No. 15-CV-673 (RNC), 2018 WL 1582515, at *7 (D. Conn. Mar. 31, 2018) (quoting *Hart v. FCI Lender Servs., Inc.*, 797 F.3d 219, 225 (2d Cir. 2015)).  "Courts must ask whether 'a consumer receiving the communication could reasonably interpret it as being sent 'in connection with the collection of a debt,' rather than inquir[e] into the sender's subjective purpose."  *Id.* (quoting *Hart*, 797 F.3d at 225).  The Second Circuit has found that a letter was sent in connection with the collection of a debt when it "directed the recipient to mail payments to a specified address," "referred to the FDCPA by name," and "informed the recipient that he had to dispute the debt's validity within thirty days."  *Carlin v. Davidson Fink LLP*, 852 F.3d 207, 215 (2d Cir. 2017) (citing *Hart*, 797 F.3d at 226).  In *Carlin*, the panel highlighted that, "most importantly, the letter 'emphatically announce[d] itself as an attempt at debt collection: 'THIS IS AN ATTEMPT TO COLLECT UPON A DEBT, AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.'"  *Id.* (quoting *Hart*, 797 F.3d at 226); *see also id.* (also relying on letter's statement that "PLEASE BE ADVISED THAT DAVIDSON FINK LLP IS A LAW FIRM ACTING AS A

---

1, ¶ 59.)  However, since the payoff statements do not mention late fees (*see* Compl. Ex. 21, Dkt. 1-21), the Court does not address this argument.

DEBT COLLECTOR.  THIS IS AN ATTEMPT TO COLLECT A DEBT.  ANY INFORMATION

OBTAINED FROM YOU WILL BE USED FOR THAT PURPOSE").

    Here, the payoff statement provides an address for how Plaintiff can "remit funds" and

includes a "payment due date."  (Compl. Ex. 21, Dkt. 1-21, at ECF 2, 4.)  Crucially, on the fourth

page of the payoff statement, it states that "[t]his communication from a debt collector is an attempt

to collect a debt and any information obtained will be used for that purpose."  (*Id.* at ECF 5.)  These

facts plainly are sufficient to establish that the payoff statement was sent in connection with the

collection of a debt and is therefore subject to the FDCPA.  Accordingly, the Court will determine

whether Plaintiff has stated a claim under FDCPA §§ 1692c, 1692e, and/or 1692f based on

Defendant's payoff statements.

a.    <u>Section 1692c</u>

    Under the FDCPA, "a debt collector may not communicate with a consumer in connection

with the collection of any debt[,] . . . if the debt collector knows the consumer is represented by an

attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's

name and address."  15 U.S.C. § 1692c (a)(2).  "In order to prevail under 1692c(a)(2), plaintiff

must prove that defendant contacted [him] when it had actual knowledge that [he] was represented

by an attorney."  *Dragon v. I.C. Sys., Inc.*, 483 F. Supp. 2d 198, 203 (D. Conn. 2007) (internal

quotation marks, alterations, and citation omitted).  Here, Plaintiff alleges that he had notified

Defendant that he was represented by counsel as early as November 2013.  (Compl. Ex. 23, Dkt.

1-23, at ECF 4.)  Nonetheless, Defendant sent payoff statements to Plaintiff, at his work address,

26

in April 2018.  (Compl. Ex. 21, Dkt. 1-21.)  Accordingly, Plaintiff has sufficiently alleged that Defendant violated Section 1692c.[27]

b.   <u>Sections 1692e and 1692f</u>

"The FDCPA prohibits a 'debt collector' from using 'any false, deceptive, or misleading representation or means in connection with the collection of any debt[,]' or 'unfair or unconscionable means to collect or attempt to collect any debt.'"  *Hill v. DLJ Mortg. Capital, Inc.*, No. 15-CV-3083 (SJF) (AYS), 2016 WL 5818540, at *6 (E.D.N.Y. Oct. 5, 2016) (emphasis omitted) (quoting 15 U.S.C. §§ 1692e, 1692f), *aff'd*, 689 F. App'x 97 (2d Cir. 2017).  Plaintiff argues that Defendant's payoff statement is both misleading and an unconscionable means to collect a debt because the debt amount includes fees, totaling $7,743.00, that were "not yet due as of the date of the Payoff Statement."  (Compl., Dkt. 1, ¶ 63.)  Specifically, Plaintiff alleges that those fees and costs, identified as the "loan level advance balance" on the payoff statement, included attorney's fees and costs related to the underlying state foreclosure action which is still pending.  (*See* Compl. Ex. 22, Dkt. 1-22, at ECF 3.)

The Second Circuit has noted that "a debt collector's inclusion of estimated attorney's fees and costs in the collection letter could be a violation of the FDCPA, even if allowed under the contractual agreement between the parties[.]"  *Derosa v. Comput. Credit, Inc.*, 295 F. Supp. 3d 290, 297 (E.D.N.Y. 2018) (describing the Second Circuit's analysis in *Carlin*, 852 F.3d at 216).  In *Carlin*, the Second Circuit, analyzing whether a debt collector had adequately stated the amount

---

[27] Though Plaintiff does not plead what actual damages he incurred as a result of this violation, the Court notes that the FDCPA also allows for statutory damages.  *See Nero v. Law Office of Sam Streeter, P.L.L.C.*, 655 F. Supp. 2d 200, 210 (E.D.N.Y. 2009), *as amended* (Dec. 4, 2009) ("All that is required for an award of statutory damages [under the FDCPA] is proof that the statute was violated, although a court must then exercise its discretion to determine how much to award, up to the $1,000 ceiling.") (citation omitted) (quoting *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 86 (2d Cir. 1998)).

27

of debt under FDCPA § 1692g, highlighted that "if [a debt collector] improperly included fees and costs that it was not entitled to under the note (absent a judgment), the Payoff Statement would plainly be insufficient under [the FDCPA]." *Carlin*, 852 F.3d at 216. However, the *Carlin* panel did not reach that issue because "the Payoff Statement does not specify what the 'estimated fees, costs, [and] additional payments' are, and thus we cannot say whether those amounts are properly part of the amount of the debt." *Id.* The Second Circuit's analysis as to what information a consumer needs nonetheless provides helpful guidance for Plaintiff's § 1692e claim, given that § 1692e focuses on whether a debt collection has made "false, deceptive, or misleading representation[s]." 15 U.S.C. § 1692e. In *Carlin*, the panel held that the payoff statement at issue violated the FDCPA because

> it omits information allowing the least sophisticated consumer to determine the minimum amount she owes at the time of the notice, what she will need to pay to resolve the debt at any given moment in the future, and an explanation of any fees and interest that will cause the balance to increase.

*Carlin*, 852 F.3d at 216; *id.* ("We do not hold that a debt collector may never satisfy its obligations under [the FDCPA] by providing a payoff statement that provides an amount due, including expected fees and costs.")

Here, in contrast to *Carlin*, the payoff statements that Plaintiff received provide enough information so that even the least sophisticated consumer can understand the nature of the "loan level advance balance" and therefore "understand how these fees are calculated, whether they may be disputed, or what provision of the note gives rise to them." *Id.* First, each payoff statement provides a separate amount for the fees and costs it might not yet be entitled to.[28] (*See* Compl. Ex.

---

[28] These amounts are labeled as "loan level advance balance" on the payoff statement. (Compl. Ex. 21, Dkt. 1-21, at ECF 2.) Though the Court finds that this label could be more explicit as to what it contains, given the other categories listed in the statement, *i.e.*, "unpaid principal balance," "interest calculated to [date]," and "escrow/impound advance balance" (*id.*), the Court finds that even the least sophisticated consumer can deduce that the attorney's fees and costs are

21, Dkt. 1-21, at ECF 2.)  *Cf. Carlin*, 852 F.3d at 215 (noting that the payoff statement included "a 'Total Amount Due,' but that amount may have included *unspecified* 'fees, costs, additional payments, and/or escrow disbursements' that were not yet due at the time the statement was issued").  Furthermore, the payoff statement provides a comprehensive explanation for these fees:

> If the account is currently subject to a pending foreclosure or bankruptcy action, the attorney fees and costs for services rendered that have been incurred with respect to this pending action have been included in the outstanding amounts due. Legal actions may continue after the date of this letter, and if so, will result in additional attorney fees and costs.  An estimate of those amounts to be incurred between the date of this quote and the good through date are included.  In the event that upon completion of the related legal work the actual legal fees and costs charged by the attorney SPS are less than the estimates provided by the attorney in this quote, SPS will apply such overage to any other amounts due and owing.  If there are no amounts due, SPS will refund such overage directly to the customer.

(Compl. Ex. 21, Dkt 1-21, at ECF 3.)  Furthermore, the payoff statement also notes that "[t]he amounts set forth in this Payoff Statement are subject to final verification."  (*Id.*)  The Court finds that this explanation is sufficient to allow even the least sophisticated consumer to understand what he owes at the time of the notice, as well as how and why the debt might increase.  In fact, the Second Circuit has explained that "applying *Carlin*'s language broadly to all debt collection letters would likely prove untenable as a practical matter."  *Kolbasyuk v. Capital Mgmt. Servs., LP*, 918 F.3d 236, 241 n.4 (2d Cir. 2019).  It noted, for example, that it might be impossible for a debt collector to provide the exact amount of debt owed at a future point when the relevant interest rate is variable.  *Id.* (discussing *Miller v. McCalla, Raymer, Padrick, Cobb, Nichols, & Clark, L.L.C.*, 214 F.3d 872, 875 (7th Cir. 2000) (Posner, J.)).  Likewise, here, it is impracticable for Defendant

---

included in the "loan level advance balance."  *See Ellis v. Solomon & Solomon, P.C.*, 591 F.3d 130, 135 (2d Cir. 2010) ("The hypothetical least sophisticated consumer does not have the astuteness of a 'Philadelphia lawyer' or even the sophistication of the average, everyday, common consumer, but is neither irrational nor a dolt.") (internal quotation marks and citation omitted).

to provide the exact amount in attorney's fees and costs it will be entitled to[29] while the underlying state court litigation is still ongoing.  Instead, it has provided an explanation as to what the fees are based on, why the final balance as to those fees might be different than the sum provided in the payoff statement, and an explanation for how it plans to remedy any potential overpayment.  This is sufficient to avoid FDCPA liability under Section 1692e.  *See Taubenfliegel v. EGS Fin. Care, Inc.*, No. 18-CV-1962 (ARR) (JO), 2018 WL 3079697, at *4 (E.D.N.Y. June 21, 2018) (noting that the Second Circuit, interpreting *Carlin*, "expressly rejected a requirement of exhaustive disclosure"), *aff'd*, 764 F. App'x 76 (2d Cir. 2019).

Likewise, the payoff statement does not violate the FDCPA's prohibition on the use of "unfair or unconscionable means" to collect a debt.  *See* 15 U.S.C. § 1692f.  "The Second Circuit has held that the term 'unfair or unconscionable means' refers to practices that are 'shockingly unjust or unfair, or affronting the sense of justice, decency, or reasonableness.'"  *Polak v. Kirschenbaum & Phillips, P.C.*, No. 17-CV-1795 (MKB) (PK), 2018 WL 1189337, at *5 (E.D.N.Y. Feb. 16, 2018) (quoting *Arias v. Gutman, Mintz, Baker & Sonnenfeldt LLP*, 875 F.3d 128, 135 (2d Cir. 2017)), *report and recommendation adopted*, 2018 WL 1187400 (E.D.N.Y. Mar. 6, 2018).  The only unconscionable or unfair practice Plaintiff points to with respect to the payoff statement is that it includes a charge for fees not yet due.  (*See* Compl., Dkt. 1, ¶ 63.)  However, given that Plaintiff's mortgage agreement allows the collection of these fees, Defendant's inclusion of these fees, when combined with an explanation of why they are included and a plan for how to remedy any potential overpayment, is not sufficient to state a violation of § 1692f.  *Cf.*

---

[29] Plaintiff does not contest that his mortgage note allows for the collection of these attorney's fees and costs.  (*Cf.* Compl., Dkt. 1, ¶ 63 (noting that these sums are "not yet due" but not arguing that Defendant cannot collect these types of costs and fees); *see also* Def.'s Ex. 3, Dkt. 18-4, at ECF 49.)

*Taubenfliegel*, 2018 WL 3079697, at *4 ("It is not unfair or unconscionable to inform plaintiff of the exact amount he owes, tell him that it may increase over time, and provide him with a way to contact the debt collector."); *Polak*, 2018 WL 1189337, at *6 ("Even a communication that is false, deceptive or misleading under Section 1692e might not constitute 'unfair or unconscionable means' under Section 1692f.").

Accordingly, the Court finds Plaintiff has failed to adequately allege that Defendant violated Sections 1692e and 1692f of the FDCPA.

## II.   Plaintiff's Proposed Amended Complaint

Under Federal Rule of Civil Procedure 15(a), "leave to amend shall be freely given when justice so requires." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (internal quotation marks and citation omitted); *see also* Fed. R. Civ. P. 15(a). "Under this liberal standard, a motion to amend should be denied only if the moving party has unduly delayed or acted in bad faith, the opposing party will be unfairly prejudiced if leave is granted, or the proposed amendment is futile." *Agerbrink v. Model Serv. LLC*, 155 F. Supp. 3d 448, 452 (S.D.N.Y. 2016) (citations omitted); *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2006) (noting that a motion to amend "should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies . . . , or undue prejudice to the non-moving party") (citation omitted). "Leave to amend may be denied on grounds of futility if the proposed amendment fails to state a legally cognizable claim or fails to raise triable issues of fact." *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 726 (2d Cir. 2010) (citation omitted). However, in determining whether Plaintiff's proposed new claims are futile, "courts need not determine futility based only on an assessment of the proposed amendments—that is, the complaint presented to the court for its consideration." *Panther Partners Inc. v. Ikanos Commc'ns,*

*Inc.*, 347 F. App'x 617, 622 (2d Cir. 2009) (summary order) (citation omitted).  "Instead, courts may consider all possible amendments when determining futility."  *Id.*  Furthermore, as the Court has already noted *supra*, "[t]he Second Circuit has made clear that district courts 'should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated.'"  *Ramnarine*, 2019 WL 5309994, at *3 (quoting *Cuoco*, 222 F.3d at 112).

A.      **Plaintiff's First Motion to Amend**

First, Plaintiff seeks to add a claim under § 487 against Defendant's counsel, Kenneth Flickinger, one of the attorneys representing Defendant in this lawsuit.  (Plaintiff's Motion to Amend ("Pl.'s Mot."), Dkt. 23, at 1.)  "Judiciary Law § 487 makes liable in a civil action any 'attorney or counselor' who '[i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party.'"  *Michelo v. Nat'l Collegiate Student Loan Tr. 2007-2*, No. 18-CV-1781 (PGG), 2019 WL 5103885, at *27 (S.D.N.Y. Oct. 11, 2019) (quoting N.Y. Judiciary Law § 487(1)).  "[N]umerous New York State courts interpreting th[is] statute, as well as federal courts construing the state court decisions, have concluded that liability attaches" under this law "only if the deceit is 'extreme' or 'egregious.'"  *Ray v. Watnick*, 182 F. Supp. 3d 23, 29 (S.D.N.Y. 2016) (collecting cases), *as amended* (May 3, 2016), *aff'd*, 688 F. App'x 41 (2d Cir. 2017).  Additionally, "[a] plaintiff also has to establish that damages were caused by the deceit" in order to succeed on a Section 487 claim."  *Iannazzo v. Day Pitney LLP*, No. 04-CV-7413 (DC), 2007 WL 2020052, at *11 (S.D.N.Y. July 10, 2007) (citation omitted).  Plaintiff argues that Mr. Flickinger violated Judiciary Law § 487 in litigating this instant action by arguing for the application of the *Colorado River* doctrine for the first time in his reply brief and "persistently

misstat[ing] the fact[s] of the case in regard to the 'Lack of Default Judgment' against [Plaintiff]." (Pl.'s Mot., Dkt. 23, at 1–2 (emphasis in original).)

The Court disagrees.  First, defense counsel in this matter was correct to argue that, under the *Colorado River* doctrine, federal courts can abstain when a plaintiff asks a federal court to exercise jurisdiction over parallel state court litigation.  *See generally Sitgraves v. Fed. Home Loan Mortg. Corp.*, 265 F. Supp. 3d 411 (S.D.N.Y. 2017).  In fact, the Court relies on this doctrine to deny Plaintiff's other motion to amend, *see infra*.  Likewise, the Court finds that Defendant's counsel in this matter has accurately described the events of the underlying state foreclosure proceeding.  (Defendant's Opposition Brief, Dkt. 24, at ECF 2–3.)  Defendant counsel's conduct in this instant action is therefore neither extreme nor egregious.  *See Seldon v. Lewis Brisbois Bisgaard & Smith LLP*, 984 N.Y.S.2d 23, 24 (App. Div. 2014) ("Plaintiff's allegations do not amount to acts of deceit, and do not give rise to any inference that the defendant lawyers making the statements, which mainly consist of simple advocacy, acted with intent to deceive.") (citations omitted).  As a result, Plaintiff has failed to adequately state a § 487 claim as to Mr. Flickinger, such a claim therefore could not withstand a motion to dismiss, making Plaintiff's first motion to amend futile.  Accordingly, this motion to amend is denied.

## B.    Plaintiff's Second Motion to Amend

Plaintiff also seeks to file a motion to amend to add another § 487 claim against the Baum Defendants.  (Plaintiff's Letter, Dkt. 25.)  Though Plaintiff has already asserted this § 487 claim against the Baum Defendants in state court, he now seeks to add that exact claim to this litigation.  (*Id.* ("Accordingly, I [] respectfully request to add the above mentioned names, as defendant(s) for their violations of []§ 487 in the above-entitled [sic] action . . . .").)  When a court is asked to exercise jurisdiction over a parallel state claim, as is the case here, it must decide whether

"considerations of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 15 (1983) (internal quotation marks and footnote omitted), warrant application of the *Colorado River* abstention doctrine.  Though "[t]he mere fact of concurrent state and federal proceedings 'does not, without more, warrant staying exercise of federal jurisdiction,'" *All. of Am. Insurers v. Cuomo*, 854 F.2d 591, 602 (2d Cir. 1988) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 816 (1976)), "in certain other 'exceptional circumstances,' a federal court may abstain from exercising jurisdiction when parallel state-court litigation could result in 'comprehensive disposition of litigation' and abstention would conserve judicial resources," *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 100 (2d Cir. 2012) (quoting *Colorado River*, 424 U.S. at 813, 817–18).

> To determine whether to abstain pursuant to *Colorado River* in the face of "parallel state-court litigation," a court considers at least six factors: "(1) whether the controversy involves a res over which one of the courts has assumed jurisdiction; (2) whether the federal forum is less inconvenient than the other for the parties; (3) whether staying or dismissing the federal action will avoid piecemeal litigation; (4) the order in which the actions were filed, and whether proceedings have advanced more in one forum than in the other; (5) whether federal law provides the rule of decision; and (6) whether the state procedures are adequate to protect the plaintiff's federal rights."

*Aponte v. Diego Beekman M.H.A. HDFC*, No. 16-CV-8479 (JPO), 2019 WL 316003, at *5 (S.D.N.Y. Jan. 24, 2019) (quoting *Niagara Mohawk Power Corp.*, 673 F.3d at 100–01).  "In evaluating these factors, 'the balance is heavily weighted in favor of the exercise of jurisdiction,' and '[o]nly the clearest of justifications will warrant [abstention].'" *Id.* (quoting *Niagara Mohawk Power Corp.*, 673 F.3d at 100–01).

Here, given that Plaintiff is seeking to add the exact same claim as the Appellate Division has recently reinstated, the Court finds that the two suits are parallel.  *See Niagara Mohawk Power Corp.*, 673 F.3d at 100 ("Suits are parallel when substantially the same parties are

contemporaneously litigating substantially the same issue in another forum.") (citation omitted). Accordingly, the Court will analyze whether, if Plaintiff were allowed to add this § 487 claim against the Baum defendants to his complaint, the six *Colorado River* factors would nonetheless favor abstention.

The Court finds that they do.  First, though Plaintiff's § 487 claim is not specifically about his property, the underlying action relevant to this § 487 claim is the foreclosure proceeding, in which the state court has assumed jurisdiction over that property.  Therefore, the Court finds that the first factor militates in favor of invoking the doctrine.  *Cf. Sitgraves*, 265 F. Supp. 3d at 414 (noting that in a foreclosure procedure, the state court has "jurisdiction over the *res*, the property, which is located in New York") (emphasis omitted).  The second factor is neutral, given that both courts are located within the same city, which counsels against abstention.  *Id.* ("Where the federal forum and the state forum are equally convenient, the second factor counsels against abstention.") (citations omitted).

The third factor favors abstention.  Though Plaintiff's 2017 Action, as well as this action, both nominally relate to his foreclosure proceeding in state court (*see generally* Compl., Dkt. 1, ¶ 15), meaning that some piecemeal litigation is inevitable, the Court finds that Plaintiff's § 487 claim is more closely related to the underlying state foreclosure action than any of the RESPA and FDCPA claims asserted in Plaintiff's federal actions.  Specifically, while Plaintiff's RESPA and FDCPA claims focus on various written communications that Defendant sent within the last three years outside of the foreclosure procedure, the § 487 claim is expressly based on, and limited to, the behavior of the attorneys who brought the foreclosure action.  (*See* Appellate Division Decision & Order, Dkt. 26-1, at 4 (noting that Plaintiff "alleged that the Baum defendants violated Judiciary Law § 487 by, inter alia, colluding with others to forge an assignment and file a foreclosure action

using a complaint containing false allegations to deceive the court and others.").) Furthermore, Plaintiff's letter indicates that he is seeking to add the exact same state law claim to the instant action. (*See* Plaintiff's Letter, Dkt. 25.) "[M]aintaining virtually identical [claims] in two forums under these circumstances would waste judicial resources and invite duplicative effort," therefore, "the 'avoidance of piecemeal litigation is best served by leaving [this claim] in the state court.'" *Sitgraves*, 265 F. Supp. 3d at 414 (S.D.N.Y. 2017) (quoting *Arkwright–Boston Mfrs. Mut. Ins. Co. v. City of New York*, 762 F.2d 205, 211 (2d Cir. 1985)).

Finally, the fourth, fifth, and sixth factors support a finding that abstention is appropriate. As to the fourth factor, Plaintiff filed the claim in state court first and that claim has already been subject to one round of appellate review. In contrast, here, the claim would be newly added to an action that has not yet proceeded to discovery. The fifth factor also favors abstention since state law provides the rule of decision. Lastly, the sixth factor too favors abstention: "[t]here is no reason to think that the New York State court hearing the [claim] will not protect [plaintiff's] rights. It is thoroughly familiar with such litigation, and a fully adequate forum for adjudication of the parties' rights." *Sitgraves*, 265 F. Supp. 3d at 415. In fact, given that the state court also presided over the portion of the foreclosure action out of which Plaintiff's claim arises, it is particularly well-suited, and far better suited than this Court, to ensure that Plaintiff's rights under § 487 are protected.

Considering these factors in their totality, the Court finds that, if Plaintiff were allowed to amend his complaint with his proposed § 487 claim against the Baum defendants, the *Colorado River* doctrine would counsel strongly in favor of abstention, which would result in the Court dismissing the claim. Allowing Plaintiff to amend his claim would therefore be futile. Accordingly, the Court denies Plaintiff's second motion to amend as well.

### C.      Leave to Amend

Finally, Plaintiff also seeks leave to amend his complaint if the Court dismisses any of his claims.  (Plaintiff's Brief in Opposition, Dkt. 20, at 25.)  As noted *supra*, the Court has identified two claims that it will grant Plaintiff leave to amend, provided he has a good faith basis for doing so.  First, with respect to his RESPA claim, Plaintiff is granted leave to amend if he has a good faith basis to allege that Defendant's failure to adequately respond to any of his QWRs caused specific, actual damages.  Second, with respect to his FDCPA claim, Plaintiff is granted leave to amend if he can show that Defendant, within the applicable statute of limitations, sent any monthly mortgage statement directly to Plaintiff and that the monthly statement attempted to collect a debt in a manner that violates the FDCPA.

Plaintiff is not granted leave to amend any of his other claims, *i.e.*, his RESPA claims based on Defendant's imposition of the LPI Policy or failure to refund any LPI Policy charges paid, and his FDCPA §§ 1692e and 1692f claims based on Defendant's payoff statements.  *See AEP Energy Servs. Gas Holding Co.*, 626 F.3d at 726 (2d Cir. 2010) (holding that "[l]eave to amend may be denied on grounds of futility if the proposed amendment fails to state a legally cognizable claim").  Therefore, those claims are dismissed with prejudice.

## CONCLUSION

For the reasons stated above, the Court grants in part and denies in part Defendant's motion to dismiss.  Specifically, the Court grants Defendant's motion as to Plaintiff's RESPA claims based on Defendant's imposition of the LPI Policy or the failure to refund LPI Policy charges, as well as his FDCPA §§ 1692e and 1692f claims as to Defendant's payoff statements.  These claims are dismissed with prejudice.  The Court denies Defendant's motion as to Plaintiff's FDCPA § 1692c claim relating to Defendant's payoff statement.  That claim will proceed to discovery.

Additionally, though the Court denies Plaintiff's motions to amend, it does grant him leave to amend his RESPA claim as to damages caused by Defendant's failure to adequately respond to his QWRs and his FDCPA claim as to Defendant's monthly mortgage statements, if he has a good faith basis for doing so.  Plaintiff shall file his amended complaint within ninety (90) days from the date of this Order.  Plaintiff is advised that the amended complaint will completely replace the original complaint, so he should include his FDCPA § 1692c claim in his Amended Complaint. This new filing must be captioned "Amended Complaint" and shall bear the same docket number as this Memorandum and Order.  All further proceedings shall be stayed for 90 days or until further Order of the Court.  If Plaintiff fails to file an amended complaint within the time allowed, the Court will enter judgment dismissing this action.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: April 22, 2020
      Brooklyn, New York